UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

DIGIZIP.COM, INC.,

                : 

         Plaintiff,                  <u>OPINION AND ORDER</u>

                : 

     -v.-                  14 Civ. 1741 (GWG)

                : 

VERIZON SERVICES CORP., VERIZON NEW
ENGLAND INC., VERIZON PENNSYLVANIA   :
INC., VERIZON NORTH LLC and VERIZON
NEW JERSEY INC.,              :

         Defendants.       :
-------------------------------------------------------------x

       The plaintiff in this action, Digizip.com, Inc. ("Digizip"), has brought claims for breach of contract and unjust enrichment under New York law against entities that we refer to collectively as "Verizon."  Verizon now moves to dismiss Digizip's complaint pursuant to Fed. R. Civ. P. 12(b)(1) or 12(b)(6), or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56.[1]  The parties have consented to a United States Magistrate Judge presiding over this case pursuant to 28 U.S.C. § 636(c).  For the reasons that follow, Verizon's motion is granted in part and denied in part.

---

[1]  <u>See</u> Notice of Motion, filed July 2, 2015 (Docket # 39); Affidavit of Jerri D. Plummer, filed July 2, 2015 (Docket # 40) ("Plummer Aff."); Memorandum of Law in Support of Defendants' Renewed Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment, filed July 2, 2015 (Docket # 41) ("Verizon Mem."); Statement of Material Facts Pursuant to Local Rule 56.1, filed July 2, 2015 (Docket # 42); Digizip's Response to Defendants' Statement of Material Facts Pursuant to Rule 56.1 upon Defendant's Renewed Motion, filed Aug. 12, 2015 and refiled Aug. 14, 2015 (Docket ## 43, 47); Declaration of Gregory Schneider, filed Aug. 12, 2015 (Docket # 44) ("Schneider Decl."); Declaration of Chris S. Barton, filed Aug. 12, 2015 (Docket # 45) ("Barton Decl."); Plaintiff's Memorandum of Law in Opposition to Defendants' Renewed Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment, filed Aug. 12, 2015 (Docket # 46) ("Digizip Mem."); Reply Memorandum of Law in Support of Defendants' Renewed Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment, filed Aug. 28, 2015 (Docket # 48) ("Verizon Reply"); Verizon's Response to Digizip's Statement of Additional Material Facts Pursuant to Local Rule 56.1, filed Aug. 28, 2015 (Docket # 49).

I.     <u>BACKGROUND</u>

This case centers around a series of written contracts known as "Service Agreements" that Digizip entered into with each of the defendants.  <u>See</u> Complaint and Jury Demand, filed Mar. 13, 2014 (Docket # 2) ("Compl."), ¶ 2.  Under the Service Agreements, Digizip resold Verizon's telephone services to businesses in New York, New Jersey, Massachusetts, and Pennsylvania from July 1, 2005 until December 31, 2012.  <u>Id.</u>  Each of the Service Agreements contained a section entitled "Tax Exemptions and Exemption Certificates," which provided that if Digizip was exempt from paying a tax and complied with the procedures to certify that exemption, Verizon would not collect that tax.  <u>See id.</u> ¶¶ 28, 30, 32, 35.  Digizip contends that it was exempt from certain surcharges and taxes, and that it provided Verizon with the necessary proof of this exempt status, but that Verizon nonetheless continued to include those surcharges and taxes on its monthly bills to Digizip from approximately September 2005 through November 2011.  <u>Id.</u> ¶¶ 3, 36, 39.  By Digizip's calculation, the total amount it paid to Verizon in exempt surcharges over this period was $386,451.57.  <u>See id.</u> ¶ 9.  Digizip first discovered these overpayments in April 2013.  <u>Id.</u> ¶ 39.  When Digizip brought the issue to Verizon's representative, Verizon refused to credit Digizip for its past overpayment.  <u>Id.</u> ¶¶ 40-41.

Before the overpayments came to Digizip's attention, however, Digizip had sold its business to a nonparty known as Wholesale Carrier Services, Inc. ("WCS").  <u>See</u> Purchase and Sale Agreement, annexed as Ex. 1 to Schneider Decl. ("Purchase and Sale Agreement"), at 1. That sale was accomplished through a transfer of assets from Digizip to WCS.  <u>See id.</u> § 3.01.  In an agreement entered into by WCS, Digizip, and Verizon just prior to the completion of Digizip's sale to WCS, Verizon agreed to Digizip's assignment of the Service Agreements to WCS, in return for a payment to Verizon of $433,380.71, "an amount less than the full amount"

Verizon contended was due at that time under the Service Agreements. Consent to Assignment of Contracts from Digizip.com, Inc. ("Digizip"), to Wholesale Carrier Services, Inc. ("WCS"), annexed as Ex. 1 to Plummer Aff. ("Consent to Assignment"), at 2.

Digizip filed the complaint in the instant case on March 13, 2014. It seeks to recover $386,451.57 in damages for breach of contract and the same amount for unjust enrichment, plus interest, attorney's fees, court costs, and disbursements. Compl. ¶¶ 46, 50. Verizon filed its first motion to dismiss on June 6, 2014. See Notice of Motion, filed June 6, 2014 (Docket # 17). In that motion, Verizon argued, inter alia, that Digizip had assigned the instant claims to WCS through the Purchase and Sale Agreement and that Digizip therefore lacked standing to pursue them. See Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment, filed June 6, 2014 (Docket # 18), at 11-13. Digizip opposed the motion by arguing, inter alia, that the claims at issue had not been transferred by the Purchase and Sale Agreement. See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment, filed July 25, 2014 (Docket# 23), at 8-10. It also argued that if the claims had been assigned to WCS, they were later assigned back to Digizip by means of an email from WCS's CEO, Chris Barton (the "Barton email"). See id. at 11-12.

The Court subsequently ordered the parties to address the question of whether the Barton email constituted a "ratification" within the meaning of Fed. R. Civ. P. 17(a)(3), assuming it was not a valid re-assignment. See Order, filed Dec. 10, 2014 (Docket # 29), at 2. In its responsive letters, Digizip again argued that the Barton email constituted a valid re-assignment but conceded that it would not constitute a ratification under Rule 17(a)(3). See Letter from Mark I. Reisman, filed Jan. 23, 2015 (Docket # 31), at 1-2; Letter from Mark I. Reisman, filed Jan. 30,

2015 (Docket # 33), at 1.

On March 20, 2015, we issued an Opinion and Order holding that (1) the Purchase and Sale Agreement transferred the claims at issue to WCS, and (2) the Barton email did not constitute a valid re-assignment of the claims to Digizip.  See Digizip.com, Inc. v. Verizon Services Corp., 2015 WL 1283676 (S.D.N.Y. Mar. 20, 2015) ("Mar. 20 Op."), at *4-*7.  As a result, we concluded that Digizip's claims should be dismissed for lack of standing.  See id. at *8.  However, we stayed the entry of judgment to allow WCS 60 days to ratify, join, or be substituted in as the real party in interest pursuant to Rule 17(a)(3).  See id.

On May 8, 2015, Digizip filed a declaration from Barton, in which he reiterated his belief that the instant claims were not included within the Digizip assets purchased by WCS.  See Declaration of Chris S. Barton, filed May 8, 2015 (Docket # 35) ("May 2015 Barton Decl."), at ¶¶ 14, 17.  Barton also stated that, to the extent the Court believed that the instant claims were transferred to WCS and did not consider the Barton email to be a valid re-assignment back to Digizip, "WCS hereby assigns any and all right, title and interest to such claims to Digizip," "WCS consents to have Digizip substituted for WCS as the actual party of interest in connection with this lawsuit," and "WCS . . . approves and ratifies Digizip's pursuit of recovery against Verizon in this litigation."  Id. ¶¶ 18-19.  Barton also stated that WCS "agrees to be bound by any judgment rendered in this action" relating to the claim and agrees to be bound by "any release Digizip may execute with Verizon in connection with the claims asserted in this lawsuit." Id. ¶ 20.  Barton further covenants that "WCS will not institute a separate action against Verizon" relating to these claims.

Following the filing of this declaration, Verizon filed the instant motion to dismiss.

4

II.     STANDING

    A.     Applicable Law on Standing

"It is well established . . . that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." Whitmore v. Arkansas, 495 U.S. 149, 154 (1990). Under Article III of the United States Constitution, federal courts may hear only "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2, cl. 1. Thus, "[i]f plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C., 433 F.3d 181, 198 (2d Cir. 2005); accord Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 69 (2d Cir. 2001). To satisfy the Article III standing requirement, the plaintiff must show (1) that he or she "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical;" (2) that there was a "causal connection between the injury and the conduct complained of;" and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and internal quotation marks omitted). The plaintiff must support each of these elements of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Id. at 561. The Second Circuit has stated that to determine whether a party has standing, the court "must look to the facts and circumstances as they existed at the time [the] suit was initiated." Etuk v. Slattery, 936 F.2d 1433, 1440-41 (2d Cir. 1991); see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (standing "must exist at the commencement of the litigation").

"In addition to the immutable requirements of Article III, 'the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing.'"  Bennett v. Spear, 520 U.S. 154, 162 (1997) (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 474-75 (1982)).  Unlike constitutional standing, these "judicially self-imposed limits on the exercise of federal jurisdiction" may be changed or abrogated by Congress.  Id. (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).  One such prudential limit is the rule that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  Warth v. Seldin, 422 U.S. 490, 499 (1975) (citations omitted); accord Friends of the Earth, Inc., 528 U.S. at 189.

B.      Rule 17

Rule 17(a)(1) of the Federal Rules of Civil Procedure provides that an action must be prosecuted in the name of the "real party in interest."  Rule 17(a)(3) states in relevant part:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.  After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

As the Second Circuit has noted, Rule 17

> was initially adopted to ensure that assignees could bring suit in their own names, contrary to the common-law practice. See Fed. R. Civ. P. 17 advisory committee's notes, 1966 Amendment.  However, "the modern function of the rule . . . is [ ] to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata."  Id.; see also Gogolin & Stelter v. Karn's Auto Imports, Inc., 886 F.2d 100, 102 (5th Cir.1989) ("The purpose of the rule is to prevent multiple or conflicting lawsuits by persons such as assignees, executors, or third-party beneficiaries, who would not be bound by res judicata principles."). The dismissal provision in Rule 17(a)(3) was added later "to avoid forfeiture and injustice when an understandable mistake has been made in selecting the party in whose name

6

the action should be brought." 6A Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1555 (3d ed.2014). That provision codifies the modern "judicial tendency to be lenient when an honest mistake has been made in selecting the proper plaintiff." Id.

Cortlandt Street Recovery Corp. v. Hellas Telecomms. I, S.à.r.l, 790 F.3d 411, 421 (2d Cir. 2015).

C.    Discussion

Here, WCS has assigned the claim back to Verizon and has met the elements required in case law for a ratification.  See Sojuzplodoimport v. SPI Spirits Ltd., 726 F.3d 62, 83 (2d Cir. 2013) ("to ratify a suit, the real party in interest must (1) authorize continuation of the action and (2) agree to be bound by its result") (citation omitted).  Verizon contends, however, that WCS's ratification does not cure Digizip's lack of standing because standing must be judged at the time of filing of the complaint.  See Verizon Mem. at 5-11.  Digizip responds that Rule 17 permits WCS's ratification to relate back to the time of filing, and that therefore it has standing to pursue its claims now.  See Digizip Mem. at 9-13.

In Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11 (2d Cir. 1997), the Second Circuit seemingly addressed this very issue.  In that case, it found that an assignment of a power of attorney to sue on particular claims, but not ownership of the claims themselves, was not sufficient to allow the assignee plaintiffs to bring suit in their own names.  See id. at 17-18. The court held, however, that the district court erred by not allowing an amendment to the complaint to substitute in the assignors as named plaintiffs, in part because "[a] Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants."  Id. at

7

20.[2]

Advanced Magnetics thus directed that the district court give the plaintiffs the

opportunity to use Rule 17 to overcome the standing defect it had found.  Id. at 22.   As one case

puts it, "Advanced Magnetics stands for the proposition that a standing defect at the

commencement of suit does not require dismissal of the action with prejudice."  In re Vivendi

Universal, S.A. Sec. Litig.,  605 F. Supp. 2d 570, 584 (S.D.N.Y. 2009).  To forbid ratification or

substitution potentially leads to an "unjust . . . result," id. at 585, as would certainly be the case

here if Digizip could not collect on its potential claim.  Other cases have similarly allowed a

substitution or ratification to cure a standing defect that was present when the complaint was

filed.  See, e.g., Park B. Smith, Inc. v. CHF Indus. Inc., 811 F. Supp. 2d 766, 774-75 (S.D.N.Y.

2011); Wells Fargo Nw. Bank, Nat'l Ass'n v. Varig-S.A., 2003 WL 21508341, at *3 (S.D.N.Y.

June 27, 2003), aff'd, 108 F. App'x 6 (2d Cir. 2004); Gusto Records, Inc. v. Artists Rights Enf't

Corp., 1992 WL 26746, at *3 (S.D.N.Y. Feb. 4, 1992).

 This conclusion, however, has been called into question by other courts on the ground

that, as one case puts it, "while Rule 17(a) allows for the substitution of a real party in interest, a

plaintiff must have Article III standing at the outset of the litigation."  Clarex Ltd. v. Natixis

Secs. Am. LLC, 2012 WL 4849146, at *7-8 (S.D.N.Y. Oct. 12, 2012) (internal punctuation and

citations omitted); accord Sharehold Representative Servs. LLC v. Sandoz, Inc., 2013 WL

4015901, at *7-8 (S.D.N.Y. Aug. 7, 2013); In re SLM Corp. Sec. Litig., 258 F.R.D. 112, 115-16

(S.D.N.Y. 2009).   These courts distinguish Advanced Magnetics and the other cases following it

on the ground that the plaintiff in those cases "generally ha[d] Article III standing on at least one

---

[2]  While Advanced Magnetics involved a substitution of parties, Rule 17(a)(3) gives
"ratification" the same effect.

other claim at the time the action was filed." In re SLM Corp. Sec. Litig., 258 F.R.D. at 115.

The same question came before the Second Circuit in the recent case of Cortlandt Street Recovery Corp., 790 F.3d 411 (2d Cir. 2015). In Cortlandt Street, the plaintiff was found to lack standing to pursue contract claims because of the lack of a valid assignment. See id. at 418. The plaintiff in Cortlandt Street argued that the district court erred in denying its request to amend the complaint to cure that deficiency by means of either a substitution or an assignment pursuant to Rule 17(a)(3). See id. at 420, 422. The Court did not reach this issue because it found that neither of the plaintiff's contemplated amendments — substitution or assignment — was allowed under Rule 17.[3] In dictum, however, Cortlandt Street considered the same argument raised by the defendants here: whether even a substitution, assignment or ratification under Rule 17 would be permissible inasmuch as it would not alter the fact that the plaintiffs lacked standing at the time of the filing of the original complaint. Id. at 422-23. The majority opinion noted the differences among district courts faced with this issue and also noted that a Sixth Circuit case, Zurich Insurance Co. v. Logitrans, Inc., 297 F.3d 528, 531 (6th Cir. 2002), held that where a plaintiff has no standing at the outset of litigation, it has "no standing to make a motion to substitute the real party in interest." 790 F.3d at 423. It also noted that Zurich has been "met with some criticism" and quoted a leading treatise that characterized it as "troubling." Id. (citations omitted). The author of the Cortlandt Street majority opinion also wrote a concurrence in which he emphasized that Zurich was not the law of the Second Circuit, and suggested that it

---

[3] Substitution would have destroyed diversity because both the new plaintiffs and the defendants were citizens of foreign countries, and therefore the court would have been left without subject matter jurisdiction. Id. at 423-24. An assignment would not have been permissible because it would have required "more than a 'merely formal' alteration of the complaint." Id. at 424 (citing Advanced Magnetics, 106 F.3d at 20).

should not be.  See Cortlandt Street, 790 F.3d at 425 (Sack, J., concurring).  The concurrence

opined that "the jurisdiction-at-commencement rule is not absolute," and that in certain

circumstances — particularly where a Rule 17(a) amendment is sought to cure a standing defect

resulting from a mistake but "the subject matter of the actions remains identical" — the

"pragmatic approach" of allowing the amendment might be preferable to the Zurich Insurance

court's categorical approach.  Id. at 426-27.

We are now presented with the question that Cortlandt Street did not reach:  whether

Rule 17(a)(3)'s procedure for substitution, joinder or ratification can be used where standing did

not exist at the time the lawsuit was filed.  Because Cortlandt Street noted one basis for

distinguishing Advanced Magnetics — the same basis used by Clarex Ltd. and other district

court cases — it is proper to examine it.  The distinction Cortlandt Street noted was that in

Advanced Magnetics the plaintiffs had standing at the time of the filing of the complaint as to "at

least some of its claims against the defendants" irrespective of the potential cure as to other

claims offered by Rule 17(a)(3).  790 F.3d at 422.  We question, however, why this circumstance

should matter.  Putting aside the fact that the existence of the plaintiffs' other claims did not

form any part of Advanced Magnetics' legal analysis, judgments about standing are made based

on an independent analysis of each particular claim.  Thus, it occasionally arises that some

claims are dismissed for lack of standing while others are not.  See, e.g., Weisshaus v. New

York, 2009 WL 2579215  (S.D.N.Y. Aug. 20, 2009).  If it is truly the case that the Rule 17(a)(3)

procedure cannot cure a lack of standing as to a particular claim, there is no reason why the

existence of standing as to some other claim should operate to invest Rule 17(a)(3) with the

power to revive the claim that was infirm due to lack of standing.  Put another way, if a party has

standing as to one claim, there is no reason why that fact should affect the analysis of standing as

to a different claim.

We question the result in <u>Clarex Ltd.</u> and the other cases denying the use of Rule 17 also because the doctrine that "[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed," <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 569 n.4 (1992) (quoting <u>Newman–Green, Inc. v. Alfonzo–Larrain</u>, 490 U.S. 826, 830 (1989)), is not absolute as the <u>Cortlandt Street</u> concurrence noted.  In certain circumstances, post-filing events may create subject matter jurisdiction where none existed at the time of the filing of the original complaint.  For example, "dismissal of [a] party that had destroyed diversity" as a "method of curing a jurisdictional defect ha[s] long been an exception to the time-of-filing rule."  <u>Grupo Dataflux v. Atlas Global Grp., L.P.</u>, 541 U.S. 567, 572 (2004); <u>accord</u> <u>Digizip.com, Inc.</u>, 2015 WL 1283676 at *8 n.4.

Moreover, the central concern with respect to a lack of standing in these cases is that the plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  <u>Warth</u>, 422 U.S. at 499.  That concern, which is based on the prudential strand of the standing doctrine, is not present here.  Indeed, turning to the three requirements for Article III standing, <u>see</u> <u>Lujan</u>, 504 U.S. at 560-61, and accepting the allegations in the complaint as true for the purposes of this motion, it appears that Digizip satisfied all three even at the commencement of the lawsuit.  First, it "suffered an injury in fact" — that is, it erroneously paid certain taxes and surcharges from which it was exempt. Compl. ¶¶ 3-4, 38.  Second, that injury was the direct result of conduct by Verizon — that is, Verizon's overcharging Digizip on its monthly bills pursuant to the Service Agreements.  <u>See</u> <u>id.</u> ¶¶ 3, 36, 38-39.  Finally, a refund of the amount that Digizip was overcharged by Verizon would redress Digizip's injury.

The only real concern with respect to standing is whether Digizip was the proper owner of those claims at the time it brought this suit — in other words, the concern addressed in Rule 17 as to whether Digizip was the "real party in interest."  A number of cases have noted that the concern over who is the real party in interest under Fed. R. Civ. P. 17(a) addresses only the prudential aspect of the standing rule, and therefore that the application of Rule 17 does not implicate Article III standing.  Thus, in Ensley v. Cody Res., Inc., 171 F.3d 315 (5th Cir. 1999), the court considered a state law that prohibited shareholders from bringing suits on behalf of a corporation.  Id. at 319.  It found that the state law was not "based on a lack of injury" and therefore the defendant's "standing objection [was] a prudential limitation that constitutes an objection to the real party in interest under Fed. R. Civ. P. 17(a)."  Id. at 320.  The court concluded that "[b]ecause the Federal Rules of Civil Procedure address this prudential standing requirement, they govern [the court's] inquiry."  Id.  Similarly, in Schneider v. Unum Life Ins. Co. of Am., 2008 WL 1995459, at *3-4 (D. Or. May 6, 2008), the court opined that defendant's argument that plaintiff lacked standing because the action was the property of a bankruptcy estate "conflates constitutional and prudential standing," Id. at *3.  It found that plaintiff possessed constitutional standing because she alleged an injury that in fact was traceable to defendant's actions and redressable by the court.  Id. at *4.  Schneider found that the plaintiff's lack of "prudential standing [did] not rob the court of subject matter jurisdiction, but rather can be remedied under Federal Rule of Civil Procedure 17(a)."  Id. at *3; accord Swearingen-El v. Cook Cty. Sheriff's Dep't, 456 F. Supp. 2d 986, 989 (N.D. Ill. 2006) (defendant's argument that plaintiff lacked constitutional standing because the claims belonged to the bankruptcy trustee was "not correct because at issue here is not a constitutional standing limitation, but a prudential one — specifically the real party in interest doctrine").  Thus, use of Rule 17(a)(3)  does not

expand the constitutional limits of standing.

In a case with facts nearly identical to those here, the court in <u>House of Europe Funding I Ltd. v. Wells Fargo Bank</u>, 2015 WL 5190432, at *7 (S.D.N.Y. Sept. 4, 2015), concluded that a suit by a party who lacked standing could be cured through a ratification.  In that case, the plaintiff had been found to lack standing because before the complaint was filed it had assigned its rights under the agreement being sued upon.  2015 WL 5190432, at *2.  Thereafter, the assignee ratified the plaintiff's suit pursuant to Fed. R. Civ. P. 17(a)(3).  <u>Id</u>.  The Court found no constitutional standing problem because the plaintiff's previous lack of standing had arisen only because it had "no right to pursue [the] claim" prior to the ratification.  <u>Id</u>. at 7 (citation omitted).  The court concluded that this lack of standing did not mean that plaintiff "had not suffered an injury-in-fact sufficient to satisfy Article III" prior to the ratification   <u>Id</u>.

In sum, we conclude that <u>Advanced Magnetics</u> and the terms of Rule 17(a)(3) govern the result here.  While Digizip transferred the claims to WCS prior to the commencement of this action, WCS assigned them back to Digizip and ratified this lawsuit after the litigation had commenced as contemplated by Fed. R. Civ. P. 17.  <u>See</u> May 2015 Barton Decl. ¶¶ 18-19; Order, filed May 29, 2015 (Docket # 36).   Fed. R. Civ. P. 17(a)(3) states that a ratification allows the action to proceed "as if it had been originally commenced by the real party in interest."

Importantly, allowing plaintiff to cure the standing defect through Rule 17 vindicates the three policy interests discussed in <u>Advanced Magnetics</u> and <u>Cortlandt Street</u>.  Here, as in <u>Advanced Magnetics</u>, "[t]he complaint's only pertinent flaw was the identity of the party pursuing those claims." 106 F.3d at 20.  That is, "the factual and legal allegations of the complaint would remain unaltered" if the suit continues.  <u>Cortlandt Street</u>, 790 F.3d at 422.  Second, there is no indication of "bad faith or . . .  an effort to deceive or prejudice the

defendants."  <u>Advanced Magnetics</u>, 106 F.3d at 21.  To the contrary, the standing defect in this

case was apparently the result of an "honest mistake."  <u>Cortlandt Street</u>, 790 F.3d at 421 (citation

omitted).  This mistake occurred because (1) Digizip was unaware of these claims until after it

entered into the Purchase and Sale Agreement with WCS, <u>see</u> Compl. ¶ 39; Purchase and Sale

Agreement at 1, and (2) Digizip (as well as WCS) mistakenly and in good faith believed that the

claims still belonged to Digizip, <u>see</u> Ex. 4 to Declaration of Gregory Schneider, filed July 25,

2014 (Docket # 22) (Emails between Barton and Digizip reflecting that neither party believed

that the Purchase and Sale Agreement transferred these claims to WCS).   Finally, the proposed

change does not "threaten to prejudice the defendants, who had timely notice of the substance of

the allegations, the relevant parties, and their claims."  <u>Cortlandt Street</u>, 790 F.3d at 422.   The

allegations of the complaint gave Verizon notice of the nature of the action, the relevant actors,

and the factual allegations surrounding the claimed overcharge.

     Accordingly, we will not ignore the plain command of Rule 17(a)(3).  Thus, this suit

shall "proceed[] as if it had been originally commenced by the real party in interest."

III.   <u>MOTION TO DISMISS</u>

     Having concluded that Digizip now possesses the requisite standing to pursue its claims,

we turn to Verizon's arguments on the merits of the motion to dismiss.

     A.   <u>Consent to Assignment</u>

     Verizon argues that the Consent to Assignment reflects an intention by the parties to

"settle disputes regarding the invoices at issue in the complaint."  Verizon Mem. at 12 (Verizon

refers to the "Consent to Assignment" as the "Consent and Settlement").   Digizip responds first

by arguing that the Consent to Assignment is not properly considered at this stage of the

litigation.  <u>See</u> Digizip Mem. at 13-16.  We think Digizip has the better argument on the issue of

whether the Consent to Assignment may be properly considered on a motion to dismiss in light

of the fact that Digizip does not reference it at all in the complaint.  It is not necessary to reach

this question, however, as Fed. R. Civ. P. 12(d) permits us to simply treat the motion to dismiss

on this ground as a motion for summary judgment under Fed. R. Civ. P. 56.  Such treatment is

appropriate here inasmuch as Digizip has been given a "reasonable opportunity" to present to the

Court any material pertinent to this aspect of Verizon's motion.  Fed. R. Civ. P. 12(d).[4]

To succeed on a Rule 56 motion for summary judgment, the moving party must

demonstrate that there is no genuine dispute as to any material fact at issue.  Fed. R. Civ. P.

56(a).  Verizon contends that "the unambiguous Consent and Settlement resolved the dispute at

issue," so no genuine issue of material fact remains to be decided.  Verizon Mem. at 17.

Under New York law, "it is well-settled that a valid release constitutes a complete bar to

an action on a claim which is the subject of the release."  Allen v. WestPoint-Pepperell, Inc., 945

F.2d 40, 44 (2d Cir. 1991) (quoting National Union Fire Ins. Co. v. Walton Ins. Ltd., 696 F.

Supp. 897, 901 (S.D.N.Y. 1988)).  To be valid, a release must "contain an 'explicit, unequivocal

statement of a present promise to release [a] defendant from liability.'"  Bank of Am. Nat'l Trust

& Sav. Ass'n v. Gillaizeau, 766 F.2d 709, 713 (2d Cir. 1985) (quoting Carpenter v. Machold, 86

A.D.2d 727, 727 (3d Dep't 1982)).  The parties may use any words in the release, "as long as

they manifest the releasor's intent to discharge."  Id. (citing Gordon v. Vincent Youmans, Inc.,

358 F.2d 261, 263 (2d Cir. 1965)).  The scope of a release is determined by the parties' intent.

---

[4]  In its memorandum of law in opposition to Verizon's first motion to dismiss, Digizip filed a declaration with seven exhibits supporting its position, including a copy of the Consent to Assignment, see Declaration of Gregory Schneider, filed July 25, 2014 (Docket # 22) and annexed exhibits.  With its papers in opposition to the instant motion, it has again submitted much of this evidence, see Schneider Decl. and annexed exhibits; Barton Decl. and annexed exhibits.

Id.

Verizon contends that the Consent to Assignment constituted a valid release by Digizip of any claims against Verizon under the Service Agreements.  See Verizon Mem. at 12 ("[I]n order to procure Verizon's consent to the assignment of the Service Agreements, Digizip agreed to pay Verizon $433,380.71 — an amount less than what was owed — as a compromise in settlement of the entire amount billed by Verizon in invoices through December 6, 2012.").  Our examination of the language of the Consent to Assignment, however, leads us to conclude that there is no "explicit, unequivocal statement of a present promise to release" Verizon "from liability."  Bank of Am. Nat'l Trust, 766 F.2d at 713.

By its terms, the subject matter of the Consent to Assignment did not encompass all claims between Digizip and Verizon, but was instead expressed by such phrases as "the full amount Verizon contends is due," "the entire amount due and owing to Verizon by Digizip," and Digizip's "obligations under the Agreements, whether incurred before, on or after the date of the assignment thereof, and regardless of whether incurred by Digizip or WCS."  Consent to Assignment at 2.   All of these phrases relate to obligations that Digizip owed to Verizon, not the other way around.  The Consent to Assignment nowhere mentions any of Verizon's potential obligations to Digizip.

Verizon focuses on the fact that Digizip's liabilities to Verizon and the instant claim both arose under the Service Agreements.  Verizon Mem. at 12-13.  But Verizon does not explain why this connection necessarily means that the Consent to Assignment discharged all of Digizip's potential claims against Verizon under the Service Agreements.  Verizon emphasizes, see id., that the Consent to Assignment recites that Digizip's payment to Verizon under the Consent to Assignment "represents a compromise in settlement of disputes."  Consent to

16

Assignment at 2.   This phrase, however, merely acknowledges that the payment constitutes a settlement of disputes between the parties.   It does not identify what those disputes are.   Finally, Verizon argues that a settlement of a "dispute over invoices" necessarily includes a settlement of both sides' claims.   Verizon Reply at 9.   But the phrase "dispute over invoices" is not used anywhere in the Consent to Assignment.

In the end, Verizon points to no language in the Consent to Assignment showing that the parties intended it to be a release of Digizip's claims against Verizon under the Service Agreements.   And Digizip has offered uncontested evidence that it was unaware of those claims at the time of the Consent to Assignment.   See Schneider Decl. ¶ 14.   This fact further undermines the notion that Verizon and Digizip intended to settle any such claims with the Consent to Assignment.   In sum, without more, we cannot find that the Consent to Assignment is the kind of "explicit, unequivocal statement" required for a valid release under New York law, Bank of Am. Nat'l Trust & Sav. Ass'n, 766 F.2d at 713 (citation omitted).   Thus, Verizon's motion for judgment dismissing the complaint on this ground is denied.

B.     Unjust Enrichment

Verizon moves for dismissal of Digizip's unjust enrichment claim on the ground that it is "wholly duplicative of the breach of contract claim."   Verizon Mem. at 18.   Digizip contends that dismissal of the claim would be inappropriate at this early stage, where alternative pleading is permissible.   Digizip Mem. at 20.

"The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff."   Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790 (2012) (quoting Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182 (2011)).   Under New York law, a plaintiff seeking damages for a claim of

unjust enrichment must establish three elements: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006) (quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)) (internal quotation marks omitted).

The quasi-contract theory of unjust enrichment is "an obligation the law creates in the absence of any agreement." Id. (quoting Goldman v. Metropolitan Life Ins. Co., 5 N.Y.3d 561, 572 (2005)) (emphasis in original). As the New York Court of Appeals put it, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co., 70 N.Y.2d 382, 388 (1987) (citing Blanchard v. Blanchard, 201 N.Y. 134, 138 (1911)); see also Blum v. Spaha Capital Mgmt., LLC, 2014 WL 4545925, at *11 (S.D.N.Y. Sept. 12, 2014) (dismissing plaintiff's unjust enrichment claim where a valid, enforceable contract existed). Thus, a claim for unjust enrichment is normally proper only in the absence of an express agreement between the parties. See EUA Cogenex Corp. v. N. Rockland Cent. Sch. Dist., 124 F. Supp. 2d 861, 873 (S.D.N.Y. 2000).

Moreover, a claim for unjust enrichment is "not available where it simply duplicates, or replaces, a conventional contract . . . claim." Goldemberg v. Johnson & Johnson Consumer Cos., Inc., 2014 WL 1285137, at *13 (S.D.N.Y. Mar. 27, 2014) (quoting Corsello, 18 N.Y.3d at 790. "[U]njust enrichment is not a catchall cause of action to be used when others fail." Corsello, 18 N.Y.3d at 790-91 (characterizing plaintiff's claim for unjust enrichment as duplicative because it would succeed or fail exactly the same as plaintiff's other, related claims of actionable wrongs).

18

Digizip alleges that Verizon was "unjustly enriched by improperly charging and collecting" certain surcharges.  Compl. ¶ 48.  But, as Digizip itself admits, these charges were imposed under the Service Agreements.  See Compl. ¶¶ 2, 8.  Neither party challenges the validity of these contracts.  In other words, the transactions at issue were covered by valid, express, written contracts between the parties.

Digizip offers no additional facts or arguments to distinguish its unjust enrichment claim from its breach of contract claim.[5]  Its unjust enrichment claims are based on the same facts as its breach of contract claims, see Compl. ¶¶ 44, 47-48, and the amount of damages sought for the breach of contract and unjust enrichment is exactly the same, see id. ¶¶ 45, 48.  Beyond the conclusory statement that "it is against equity and good conscience to permit the Defendants to retain the improperly charged surcharges and taxes" that Digizip seeks to recover, id. ¶ 49, there is nothing to distinguish Digizip's unjust enrichment claim from its breach of contract claim.

Digizip cites to two cases to support its pleading of unjust enrichment in the alternative to its breach of contract claim.  See Digizip Mem. at 20.  Both are distinguishable.  In Willman v. Zelman & Assocs., LLC, 2012 WL 811512 (S.D.N.Y. Mar. 12, 2012), the plaintiff's quasi-contract theory of unjust enrichment survived because the parties disputed the existence of a valid contract.  See Willman, 2012 WL 811512, at *5 ("[S]ince defendants deny that they had a contract, or owe damages, the Court is unwilling to toss out one claim when another theory might prove to be the more appropriate at a later stage . . . .").  Similarly, in Fly Shoes s.r.k. v.

---

[5] In its memorandum of law in opposition to Verizon's motion to dismiss, Digizip alleges that Verizon might not have remitted to the government the surcharges that it collected from Digizip.  See Digizip Mem. at 20.  But Digizip made no such allegation in its complaint, and we may not consider allegations that appear in a memorandum of law opposing a motion to dismiss. See, e.g., Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 178 (S.D.N.Y. 1996).

Bettye Muller Designs Inc., 2015 WL 4092392 (S.D.N.Y. July 6, 2015), the plaintiff stated that

its unjust enrichment claim was "made in the alternative to the claim for breach of contract, to

the extent that the Court might find that [defendant] did not have contracts with [plaintiff]."

Id. at *6.  Here, Digizip and Verizon do not dispute the validity of the Service Agreements.

Therefore, these cases are inapplicable.

Because the Service Agreements between the parties cover the same facts as Digizip's

unjust enrichment claims, and because the parties do not dispute the validity of those contracts,

Digizip's unjust enrichment claims are duplicative of its breach of contract claims and are

dismissed.

C.   Statute of Limitations

Verizon argues that some of Digizip's claims based on invoices from September 2005

through March 13, 2008, are time-barred and should be dismissed under Rule 12(b)(6).  See

Verizon Mem. at 20-21.  Under New York law, actions based an alleged breach of contract must

be brought within six years of the date on which they accrue.  N.Y. C.P.L.R. §§ 203(a), 213.2.  A

cause of action for breach of contract normally accrues at the time of the breach.  E.g., T & N

PLC v. Fred S. James & Co. Of New York, Inc., 29 F.3d 57, 59 (2d Cir. 1994) (citing Ely-

Cruikshank Co. v. Bank of Montreal, 81 N.Y.2d 399, 402 (1993)).  A cause of action may accrue

and trigger the running of the statute of limitations even where the plaintiff is unaware of the

breach.  See Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007); Ely-Cruikshank Co., Inc., 81

N.Y.2d at 403 (absent fraud, "the statutory period of limitations begins to run from the time

when liability for wrong has arisen even though the injured party may be ignorant of the

existence of the wrong or injury") (quoting Schmidt v. Merchs. Despatch Transp. Co., 270 N.Y.

287, 300 (1936)).

Here, Digizip asserts that Verizon breached the parties' contractual agreement by collecting certain surcharges from September 2005 through November 2011. See Compl. ¶ 3. Digizip filed its complaint on March 13, 2014. Thus any claims prior to March 13, 2008, are time-barred by New York's six-year statute of limitations for breach of contract actions.

In its memorandum of law in opposition to the motion to dismiss, Digizip does not address the statute of limitations issue with respect to the breach of contract claims at all, apparently conceding Verizon's argument on this point. Accordingly, Digizip's breach of contract claims arising before March 13, 2008, are dismissed.

IV.   CONCLUSION

For the reasons stated above, Verizon's motion to dismiss the complaint (Docket # 39) is granted in part and denied in part to the extent stated above.

Dated: October 16, 2015
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

21